AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico ▾

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. **25mr567** |
| 4260 Russel CT NE Rio Rancho, New Mexico 87124 | ) |
| and Person of Asa SHAW (DOB: XX-XX-1981) | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A (incorporated herein by reference)

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B (incorporated herein for reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Please refer to the attached Affidavit. | Please refer to the attached Affidavit. |

The application is based on these facts:

Please see the attached Affidavit of Special Agent Allison Garcia, which is incorporated herin by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Allison Garcia
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
sworn teleponically, signed electronically _____ *(specify reliable electronic means)*.

Date: 3/31/2025
_____
*Judge's signature*

City and state: Albuquerque, NM          Steven C. Yarbrough, US Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:

4260 RUSSEL CT. NE RIO RANCHO, NM
87124

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Allison Garcia, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 4260 Russel CT. NE

Rio Rancho, NM 87124 (the "PREMISES"), further described in Attachment A, for the things

described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") and have been since January 2021.  I attended Criminal Investigator training

and Special Agent Basic Training at the Federal Law Enforcement training Center (FLETC)

where I was trained to conduct firearms investigations.  My involvement in firearms trafficking

investigations since the academy has been extensive and included but is not limited to debriefing

defendants, gathering intelligence, conducting analysis of subpoena information and conducting

arrests.

3.      I have been involved in an ongoing investigation regarding the purchase and

distribution of firearms in New Mexico and elsewhere that were originally purchased by Asa

SHAW in New Mexico and recovered in crimes. Since the investigation's inception, I, as well as

other Special Agents and Task Force Officers with ATF, and law enforcement official from other

agencies have obtained information regarding the illegal gun trafficking activities of SHAW.

4.     I make this affidavit based upon my own personal knowledge, which is derived from my participation in the investigation, as well as that of fellow agents and support staff who have participated in the investigation.  In addition, I have developed information I believe to be reliable from sources:

   a.     Information provided by Task Force Officers ("TFO"), Special Agents ("SA") and Intelligence Research Specialists ("IRS") of ATF and other Federal and state agencies, including oral and written reports that I have received directly or indirectly from said investigators;

   b.     Review of ATF Forms 4473 containing firearm purchase information;

   c.     Results of physical surveillance conducted by agents and TFOs during the investigation; A review of driver's license records; and

   d.     Information derived from law enforcement databases.

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

6.     I believe there is probable cause that SHAW has committed, is committing, and will continue to commit offenses involving violations of the following statutes, and that evidence of these violations is likely to be found in the places to be searched:

   a.     18 U.S.C. § 922(a)(1)(A) – Dealing and Manufacturing of Firearms Without a License.

   b.     18 U.S.C. § 933 – Trafficking in Firearms

## EVIDENCE SOUGHT DURING SEARCH

7.      Based on my training, experience, and participation in this and in similar investigations, I know that individuals involved in illegal trafficking and unlicensed dealing and manufacturing of firearms often conceal evidence of their criminal activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences (including vehicles parked on the street when no driveway exists) and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which the individual has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes digital media, such as cell phones, computers, flash drives, or discs, plastic (filament) materials, 3D printers and associated components and storage media, tools for sanding and shaping firearms and firearms parts, as well as proceeds from sales and valuables obtained from those proceeds and documents related to those sales and proceeds.

8.      Other evidence of transportation, ordering, possession, and sale of firearms or materials to manufacture firearms can include the following: telephone bills to show numbers called by the trafficker (and potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, and other financial institution statements.  The above items are often stored on a suspect's person, in their business or residence, in their vehicles, in surrounding garages, outbuildings, carports and yards, and the residences of friends or relatives.  This type of documentation can be stored on digital media and concealed virtually anywhere.

9.      The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life.  This is also true for firearm traffickers and those who deal firearms without a license.  Information stored in electronic form on all of the above devices can provide evidence of trafficking and illegal firearms dealing.  Firearm traffickers and unlicensed dealers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the firearm trade.  These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services.  Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications.  The content of these communications will often provide evidence of firearm trafficking and unlicensed dealing.  Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the person has called or otherwise communicated with, thus identifying potential criminal associates.

10.      Firearm traffickers and unlicensed dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their firearms/firearm parts, typically for the purpose of advertising these goods for sale to others.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium.  Firearm

4

traffickers and unlicensed dealers frequently use these devices to take their photographs and videos.

11.     They also may maintain indicia of firearms possession, such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

12.     Firearm traffickers and unlicensed dealers often utilize digital video surveillance systems.  A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system.  Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that traffickers and unlicensed dealers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the person's proceeds.  Firearm traffickers and unlicensed dealers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity.  However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' trafficking activities and conversations related to trafficking or unlicensed dealing.

13.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises or in the vehicle, including contraband and other evidence seized.  Documents and items showing the identity of the person(s) owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering

machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be stored on digital media such as cell phones and computers, downloaded from online accounts, or scanned into digital format and stored on computers and related digital media.

14.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

15.     A list of items I seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

16.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

17.    *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises or other location for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant.  In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.    *The time required for an examination*.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    *Technical requirements*.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES.

7

However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*.  Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

18.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

19.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners and facial recognition features.  Some devices offer a combination of

these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's camera then analyzes, and records data based on the user's facial characteristics.  The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric

9

passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of

11

attempting to unlock the device in order to search its contents as authorized by this warrant.

## PROBABLE CAUSE

### Firearm Recoveries

20.    On April 14, 2023, an investigation was initiated on Asa SHAW after law enforcement databases revealed that SHAW was the original retail purchaser of numerous firearms that had been recovered by law enforcement and with a short time to crime[1].  SHAW was the original purchaser of approximately eleven (11) recovered firearms which are described below:

    I.     DPMS INC. A15 223 caliber rifle (short barrel) S/N: DM01712K – 198 days  time to crime (recovered in Sierra Blanca, Texas)

    II.    Anderson Manufacturing AM-15 unknown caliber rifle S/N: 14154217 – 61 days time to crime (recovered in San Diego, California)

    III.   Daniel Defense INC. M4 Carbine multi caliber rifle S/N: DD037001D – 460 days time to crime (recovered in El Paso, Texas)

    IV.   Metro Arms Corporation American CLSC Commdr 45 caliber pistol S/N: A16-01018 – 1455 days time to crime (recovered in Albuquerque, NM)

    V.    Spike's Tactical LLC ST9G 9mm caliber rifle S/N: ARG014871 – 452 days time to crime (recovered in Albuquerque, NM)

    VI.   Aero Precision M4E1 multi caliber rifle S/N: M4-0271962 – 371 days time to crime (recovered in Albuquerque, NM)

    VII.   Sons of Liberty Gun Works M4 556 caliber rifle S/N: 1776-117087 – 67 days time

---

[1] Time to crime is defined as the time from the last known retail sale of a firearm to when it is recovered in a crime.

to crime (recovered in Albuquerque, NM)

VIII.    Beretta USA Corp M9A4 9mm caliber pistol S/N: BER824323 – 198 days time to crime (recovered in Albuquerque, NM)

IX.    Smith & Wesson M&P 9 Shield 9mm caliber pistol S/N: JBC4896 – 137 days time to crime (recovered in Albuquerque, NM)

X.    Aero Precision M4E1 556 caliber rifle S/N: M4-0229833 – 1376 days time to crime (recovered in Albuquerque, NM)

XI.    FNH USA 509 9mm caliber pistol S/N: GKS0205896 – 1097 days time to crime (recovered in Denver, CO)

21.    The firearms mentioned above have been recovered in multiple states to include New Mexico, Texas, California, and Colorado as well as in different types of crimes. The Spike's Tactical rifle with serial number ending in 4871 and the Aero Precision rifle with serial number ending in 1962 were recovered in drug trafficking crimes that are currently active cases with the Drug Enforcement Administration ("DEA"). The Metro Arms Corporation pistol with serial number ending in 1018 was recovered from the witness of a homicide.  The Anderson Manufacturing rifle with serial number ending in 4217 was recovered in an unlicensed firearm dealing scheme.  The Beretta pistol with serial number ending in 4323 was recovered as a National Firearms Act firearm manufactured by SHAW.  The Daniel Defense rifle with serial number ending in 001D was recovered from a prolific firearms trafficker who had firearm recoveries in Mexico.  Based on my training, knowledge, and experience, I know that a firearm recovered in a crime within a 3-year period from the time of purchase and a high number of traces is indicative of firearms trafficking and dealing without a license.

**Firearm Interstate Travel**

13

22.        SHAW was the original retail purchaser of at least 3 firearms (see paragraphs I, II and XI) that were purchased in the State of New Mexico and recovered outside the state of New Mexico and therefore had to travel in interstate commerce to arrive in those states.

### Firearm Purchase History

23.        On March 19, 2025, I reviewed ATF Form 4473s and Acquisition and Disposition Logs from Bulldog Firearms (located at 2502 Southern Blvd SE, Unit B Rio Rancho, New Mexico 87124) that ranged from September 2021- March 2023. Bulldog Firearms is a Federally Licensed gun store in Rio Rancho, New Mexico where SHAW previously worked and continues to purchase and sell numerous firearms.  Based on a review of records from that period, Bulldog Firearms transferred approximately 54 firearms to SHAW.  Seventeen of the transferred firearms were receivers which require manufacturing procedures to occur before they can function and be sold or utilized.[2]  I know that a high number of firearms recovered in a different configuration than originally purchased is an indication of manufacturing without a license.

24.        I also reviewed records from Albuquerque Guns (located at 6301 Riverside Plaza ln NW Unit 3 Albuquerque, NM 87120).  Albuquerque Guns is a Federally licensed gun store in Albuquerque, NM.  Records indicated that Albuquerque Guns transferred approximately ten (10) firearms to SHAW from April 2021- December 2021.

25.        For all 64 firearm purchases noted above, SHAW marked "yes" on the ATF Form 4473 to question 21 (a) "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? Warning: You are not the actual

---

[2] The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants, that provides housing or a structure for the bolt, breechblock or other primary component designed to block or seal the breech prior to firing.

transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you. Exception: If you are only picking up a repaired firearm(s) for another person, you are not required to answer 21.a. and may proceed to question 21.b".

26.     I reviewed additional purchase records and ATF form 4473s from Bulldog Firearms for SHAW from January 2024 - December 2024.  According to the records, SHAW purchased approximately 23 firearms and sold approximately five (5) firearms to Bulldog Firearms.  I noted that eight (8) of the firearms purchased were receivers.  Five (5) of the eight receivers purchased were the exact same make and model, Rifle Dynamics model RD-700.  Additionally, seven (7) of the firearms purchased were 9mm caliber Glock pistols.   I know based upon my training, knowledge and experience that multiple purchases of firearms of the same make and model are indicative of firearms trafficking and dealing without a license.

27.     In 2025, I reviewed documents that revealed that SHAW purchased approximately six (6) firearms in New Mexico from 1/10/2025 – 3/32025 from three different FFLs.  Most recently on March 3, 2025, SHAW purchased a firearm, categorized as a frame or receiver from Bulldog Firearms and a handgun on March 20, 2025.

28.     For each firearm purchase listed on ATF Form 4473s, SHAW listed his name and date of birth, as well as his address of 4260 Russel CT. NE Rio Rancho, NM 87124 herein referred to as the "PREMISES".  He also listed a contact phone number of 505-236-9610 which is the same cell phone number that he listed on firearm advertisement websites such as Jason's Guns (see subsequent paragraphs).  SHAW also certified with his signature in box 22 of the Form 4473 that he understood the following statement, "I certify that my answers in Section B are true, correct, and complete.  I have read and understand the Notices, Instructions, and Definitions on ATF Form

4473.   I understand that answering 'yes' to question 21.a if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law... I further understand that the repetitive purchase of firearms for the purpose of resale to predominantly earn a profit without a Federal firearms license is a violation of Federal law."

### Federal Licensing System Checks

29.      On March 19, 2025, IRS Marcial Martinez conducted a query of the ATF Federal Licensing System ("FLS").  FLS indicated that SHAW does not currently hold a license to sell or manufacture firearms.  The query also indicated that SHAW has never applied for or held a license.

### SHAW's Knowledge of Criminal Activity

30.      On March 29, 2012, SHAW was interviewed by ATF in El Paso, Texas regarding a manufactured National Firearms Act ("NFA")[3] firearm that was recovered from Daniel Kepner by the United States Border Patrol.   Agents asked SHAW about the origin of the weapon, and he claimed that he built it using an assembly or kit and the lower receiver was Rock River Arms. SHAW advised that he installed a 7" barrel on the weapon that he ordered from Denver, CO. Agents asked SHAW if he mentioned to Kepner that the firearm needed to be registered as an NFA weapon and SHAW claimed that he did tell Kepner to file NFA forms.  SHAW told agents that he does not manufacture or modify firearms, but he will occasionally sell them if he needs money. This indicates to me that SHAW sells firearms and does so with the sole purpose to profit.  SHAW also indicated to agents that he had previously made firearm assembly sales on "Guntrader.com," which indicates to me that he is familiar with and utilizes firearm advertisement websites.

---

[3] An NFA firearm is a specific type of firearm such as machine guns, short-barreled rifles and shotguns, silencers and destructive devices that are subject to federal regulation and require registration with ATF.

**SHAW's Online Firearm Activity and Undercover Purchases**

31.     On January 4, 2024, SA Amber Pace observed an individual posting a Rifle Dynamic RD-704 Pistol for sale on the website Jason's Guns (www.jasonsguns.com), which has since been taken offline.  Based on my training and experience, I know that Jason's Guns was a publicly accessible website commonly used by individuals to advertise firearms for sale, and by prospective buyers of firearms to connect with sellers.  This posting included a phone number for prospective buyers to contact – 505-236-9610 – which was later confirmed to be used by SHAW to conduct firearms transactions.  An ATF Undercover Agent ("UCA") contacted the referenced phone number, inquiring about the firearm.  The user of the number responded, "Sorry it was recently sold" and, when asked if they had any other for sale, replied, "Will do I should have another custom ak available in about a week".  A copy of the referenced advertisement has been included below:



32.     On January 16, 2024, SA Pace observed another posting on Jason's Guns advertising another firearm – this time listed as a 'Custom AK'.  The ATF UCA once again contacted the seller, inquiring if the firearm was available.  The seller replied, "Yessir".  A copy of the referenced advertisement has been included below:

18



33.    On January 20, 2024, the ATF UCA observed a posting on Jason's Guns advertising an 'AK74 Bulgarian', which referenced "Asa at bulldog firearms" as the builder.  This posting was associated with different phone number belonging to an individual whose identity is known to me, and who I will refer to as 'SC' for the purposes of this Affidavit.  A copy of the referenced advertisement has been included below:



34.     On January 23, 2024, after arranging to look at and possibly purchase the AK74 rifle from SC, the UCA traveled to Federal Firearms Licensee ("FFL") Bulldog Firearms in Rio Rancho, NM 87124 to complete the transaction.  When the UCA arrived, they walked inside the store and observed SC (with the AK74 slung over his shoulder) and SHAW conversing at nearby counter.  SC handed the rifle, later fully identified as a Childers Guns CG2 5.4x39 Rifle SN: BDF0001, to the UCA and introduced SHAW by saying, "…and this is Asa, he's the one who built it."  SHAW and the UCA greeted each other, with SHAW confirming he built the referenced rifle.  SHAW explained, "Since that was a rifle that I built, that will come with a whatever you do to it I covi-you know.  Like I said, if you run it over with a truck, I'm not going to fix it.  You know, you know, anything wear normal, I'll fix it."  SHAW confirmed the rifle had a stamped receiver.  The UCA examined and conducted a basic function test of the firearm, observing that the firearm appeared to function as designed.  SHAW explained the firearm had a Childers receiver, that he had ordered it already made, and that it was one of their Bulgarian receivers noting

that the markings on it were proper. The UCA purchased the firearm, Childers Guns CG2 5.4x39 Rifle SN: BDF0001 and one ammunition magazine, from SC for $1,700.

35.      After the transaction, the UCA paid an unidentified store employee $21.49 (including tax) to cover the transfer fee associated with the transaction.  At one point, the referenced store employee stated, "Asa builds some nice guns".  The UCA asked if they could grab SHAW's number in case he needed work done on the firearm.  SHAW wrote his phone number on a sheet of paper as, "Asa (505) 236-9610"[4] and provided the paper to the UCA.

36.      While they conversed, SHAW stated, in part, "I can do anything from just basic AK builds, to, I mean, here was the last one."  SHAW then showed the UCA a photograph on his phone of an AK-type rifle which was the same photograph the UCA had observed in the Jason's Guns advertisement dated January 15, 2024, for a 'Custom AK'.  The UCA noted that he had previously texted SHAW about the 'Custom AK' firearm.  SHAW stated, "I brought it in, and as soon as I set it on the counter it was gone".  SHAW continued, "If you want like A-you just.  You just say hey, I want this barrel length, this caliber, this stock, you know, this color, you know.  A-and then if you want other stuff like certain furniture.  I wouldn't recommend Zenitco.  Um, love the furniture, but I did a KP9. The gun cost me $900 bucks, to fully Zenitco it was another $4,500 dollars.  Um, that's why I've been using a lot of the Midwest Alpha stuff.  It's close to Zenitco, but it's American.  I mean, you should see people's jaws drop.  They're like 'hey, I need this Zenitco handguard with this top cover and this stock', and I'm like this stock's $800 bucks alone

---

[4] Phone number 505-236-9510 was the same phone number used by SHAW in Jason's Guns listings mentioned above as well as on ATF Form 4473 paperwork.

and it's going to take six months before it gets here."[5]

37.    Before the UCA departed, SHAW stated, in part, "Hey, well, if you're into the AKs and stuff, the next time, uh, I'll, I'll, before I post anything, I'll, shoot it, see if you're interested". The UCA noted that they were big into AKs and encouraged SHAW to contact them. SHAW then stated, in part, "So I have, three that are going to be ready in the next, probably, week. One's going to be, it's just going to be a Yugo M70AB2, but it's on a tradit- a 1983 Yugo parts kit. Um. Basic. Um, where's the next one. I'm doing, this is a picture from Rifle Dynamics, but it's going to be this, the the pistol, eleven and a half. And then, where's the picture, this is the one that I'm going to buy parts for right now." SHAW then continued to explain, in part, "And like I said, any, any guns that I produce here, I'm with, I don't want anything out there that's not perfect. So, anything happens to it, you know, we take care of it." Throughout this interaction, SHAW showed the UCA photographs of the referenced firearms on his phone. The UCA thanked SHAW and told him they would be in contact later. A still image of SHAW has been included below for reference:

---

[5] Based on my training and experience, "furniture" refers to parts and accessories on firearms.



38.     From February 4, 2024, to February 13, 2024, the UCA communicated with SHAW regarding the purchase of AK-type firearms, with the UCA having specified certain, desired characteristics for the firearm.  On February 13, 2024, the UCA traveled to Bulldog Firearms to complete a planned firearms transaction.

39.     Once at Bulldog Firearms, the UCA and SHAW greeted each other.  SHAW immediately directed the UCA to the area near the counter where the previously mentioned 'RD' firearm was placed, later fully identified as a Rifle Dynamics RD700 7.62x39 Rifle SN: RD47-2108.[6] The UCA handled and observed the firearm.  The UCA asked if SHAW had 'any rounds through it' or if he had tested it.  SHAW replied, "Nah just headspaced it, I haven't even um, what do you call that crap, adjusted the gas block yet on it."  The UCA asked SHAW, "What else you got with this."  SHAW then provided the UCA with the stock for the firearm, as well as an

---

[6] As SHAW sent a photograph, purportedly of this exact firearm, in rifle-form with a stock attached, it will hereafter be identified as a rifle.  However, at the time SHAW provided it to the UCA, it was in pistol form, without the stock attached).

ammunition magazine.  SHAW noted that 'we' (inferring the store) had red dots (meaning gun

optics) for sale.  The UCA asked if SHAW had any deals for the gun optics, and SHAW inquired

if the UCA was looking for "a pistol one or a rifle one".  The UCA replied that they were looking

for a 'rifle one'.

40.     SHAW and the UCA walked to another display case, where they looked at gun

optics.  The UCA noted the optic would be used for a range of around 300 yards.  SHAW

ultimately recommended a Holosun-brand optic, identifying the price as $239.  THE UCA stated,

"Let's get it man.  Can I pull that box?".  SHAW indicated he may have an unopened one.  THE

UCA asked if 'you guys' meaning SHAW and/or the store, did engraving as well.  SHAW

indicated he was still in the test phases, as they had only had 'it' (inferring the engraver) for a

few days.  SHAW and the UCA discussed SHAW's engraving work, and the UCA's potential

desire for engraving work.

41.     SHAW and the UCA walked back to the store counter.  SHAW asked for the UCA's

ID card, which the UCA provided.  SHAW asked if the UCA wanted the low mount or the high

mount on 'it' (the optic), and  the UCA indicated they wanted the low mount.  SHAW asked if

everything was current on 'here' (meaning the UCA's ID), and the UCA replied that it was.

SHAW then directed the UCA to run 'that stuff' (referring by motion to the stock and ammunition

magazine included with the firearm) to the UCA's car.  The UCA did as directed and placed the

stock and ammunition magazine inside their vehicle in the parking lot before returning to the inside

of the store.

42.     When the UCA returned, SHAW stated, "Yeah so, that, the wood one that you saw

in the picture. Um, I went with, a different.  These reason of the price was'n, where it was at.  Is

cause I went with a different uh.  I'm seeing who's putting out the…".  At this point, the UCA and

SHAW were interrupted by another store employee calling for the UCA.  THE UCA walked to the store employee while SHAW continued speaking, "I'm trying to see whose putting out the uh, the best receivers in the game."  The UCA asked if SHAW wasn't happy with that one (the one in the photograph SHAW had sent), and what that one was (referring to the type of receiver).  SHAW replied, "It was a Childers."  The store employee directed the UCA to begin entering their information and login into the store tablet after which the UCA began filling out information associated with the ATF Form 4473 Firearms Transaction Record.  The UCA asked SHAW if the Childers receiver was not good.  SHAW replied, "Um, it was ok.  I mean, he treated everything but the rear notch where the receiver's cut that you drop the bolt in.  Should be exactly um, 30 millimeters from the um (unintelligible). But it was like 28 point whatever, so the bolt didn't just drop in, and when it's too short it causes the bolt to jump.  You know what I mean?  So I had to put it in the middle and, you know, extra work to it you know what I mean?"  The UCA asked if SHAW tested it.  SHAW replied, "Oh yeah, it's good to go once I cut it and did it, but, you know.  At that price point I could have made it myself and it would have worked the first time."  SHAW later continued, "And it was a proof-of-concept cause (unintelligible)."  The UCA indicated they liked it, and noted they would pick it up from SHAW if SHAW was able to take the stock off.  SHAW continued, "What I was thinking about doing with those.  Is instead of a uh, twelve-five do a fourteen-five pin and weld.  You know, with the the dead air on it.  Same set up, the Ulti-Mak (sp) everything.  And then on the rear wood stock, um, milling two holes in it to put a QD point on each side, you know what I mean?  So it's still old looking, but then you can use all the modern (unintelligible)."

43.    At one point, another store employee stated, "This gun, this gun…it's not in, not in yet, is it?", seeming to refer to the firearm SHAW was selling.  SHAW replied, "No sir", seeming

to indicate that the gun was not in.  Based upon the UCA's training and experience, they understood this to mean that the firearm had not been logged into the store acquisition and disposition record/inventory.

44.    SHAW and two store employees walked to the cash register. SHAW stated, "I'll cover this", seeming to refer to the Rifle Dynamics RD700 7.62x39 Rifle SN: RD47-2108 and associated transfer costs.  SHAW continued, "He's getting that", referring to the Holosun gun optic.  One of the store employees replied, "Ok."  SHAW continued, "and then from me, so I already put the, the dot on."  SHAW then read off the serial number of the firearm once again.

45.    The transaction continued while SHAW and the UCA continued to discuss military topics.  SHAW, then taking over a store employee's position at the cash register, stated, "So we'll do this one, and he'll have your receipt", seeming to refer to the Holosun optic.  SHAW scanned the Holosun optic box, confirming the price to be $239.  SHAW then relayed a total of $257.81 which was reflected on the receipt to include a charge of $239.95 for the Holosun optic, a $0.01 charge associated with the Rifle Dynamics RD700 7.62x39 Rifle SN: RD47-2108, and sales tax of $17.85.  The UCA paid $300 in cash, receiving $42.19 in change.

46.    The UCA and SHAW continued conversing, with the UCA handling and examining the firearm.  The UCA then inquired, "You said two right?", referring to the agreed upon price of $2,000.00 for the firearm.  SHAW confirmed this was correct.  The UCA then provided SHAW with $2,000.00 in cash.  SHAW counted the cash, and the transaction was concluded with the UCA taking possession of the Rifle Dynamics RD700 7.62x39 Rifle SN: RD47-2108.  The UCA was not provided with a receipt reflecting the total cost of the firearm, despite having been provided a receipt for the optic.  Based upon the UCA's training and experience, and the UCA's reported observations in Bulldog Firearms, individuals purchasing firearms associated with the store's

regular inventory would typically be provided with a receipt for not just firearms accessories, but for the purchase price of the firearms themselves. Given the context of the transaction, the fact that the UCA was provided a receipt reflecting the sale price of the firearm optic, but not for the sale price of the firearm, would seem to suggest that a vast majority of the funds derived from the sale of the firearm, with the exception of the $0.01 charge presumably reflecting the store being used to transfer the firearm, were not taken in by the store itself. In this case, $2,000 in cash was provided to SHAW for the firearm, and no receipt was provided for those funds.

47. Subsequent to this transaction, the UCA and SHAW remained in contact regarding future firearms transactions. These communications are included below:

| | | | | | |
|---|---|---|---|---|---|
| 2024/02/14 | 11:37:30 AM MST | 505-236-9610 | SMS | Incoming | I don't know if they text you, left the box for holosun here. I have it for you whenever. |
| 2024/02/14 | 01:20:42 PM MST | 505-236-9610 | SMS | Outgoing | Oh shit no they didnt. Right on ill grab it from you next time. Good shit on that rd, threw some clp on it and smooth as butter |
| 2024/02/14 | 01:43:31 PM MST | 505-236-9610 | SMS | Incoming | Hell yeah |
| 2024/02/14 | 01:49:27 PM MST | 505-236-9610 | MMS | Outgoing | This is the logo hit me if thats doable |
| 2024/02/14 | 01:50:40 PM MST | 505-236-9610 | SMS | Incoming | Easy peasy |
| 2024/02/14 | 02:15:03 PM MST | 505-236-9610 | SMS | Outgoing | Good shit |
| 2024/03/11 | 11:53:36 AM MST | 505-236-9610 | SMS | Outgoing | Yo |
| 2024/03/11 | 11:54:30 AM MST | 505-236-9610 | SMS | Outgoing | Got any more of those rds coming up? |

| | | | | | |
|---|---|---|---|---|---|
| 2024/03/11 | 11:55:25 AM MST | 505-236-9610 | SMS | Incoming | Which ones you looking for? |
| 2024/03/11 | 11:56:56 AM MST | 505-236-9610 | SMS | Outgoing | The rd704 like last time was perfect. |
| 2024/03/11 | 11:57:32 AM MST | 505-236-9610 | SMS | Incoming | Do you like the Midwest furniture or do you want like an ultimate in Standard Furniture? |
| 2024/03/11 | 11:59:06 AM MST | 505-236-9610 | SMS | Incoming | Ultimak? |
| 2024/03/11 | 12:01:26 PM MST | 505-236-9610 | SMS | Outgoing | I like the midwest havent used the ultimak before, you like it? |
| 2024/03/11 | 12:03:49 PM MST | 505-236-9610 | MMS | Incoming | It's ok if you like the optic forward on the rail. |
| 2024/03/11 | 12:04:14 PM MST | 505-236-9610 | SMS | Incoming | Tho I still use a scope mount lol. Use it to hold the light a sling mount since I'm left handed |
| 2024/03/11 | 12:07:02 PM MST | 505-236-9610 | SMS | Outgoing | Damn you got the devils hand!!!! Lol |
| 2024/03/11 | 12:07:24 PM MST | 505-236-9610 | SMS | Incoming | 😂 |
| 2024/03/11 | 12:07:50 PM MST | 505-236-9610 | SMS | Outgoing | Whats the price difference w the ultimak? |
| 2024/03/11 | 12:08:24 PM MST | 505-236-9610 | SMS | Incoming | With the ultimate rail in the new wood furniture. It's about 3 or 400 dollars cheaper. |
| 2024/03/11 | 12:09:23 PM MST | 505-236-9610 | SMS | Outgoing | So 1600-1700 a piece? |
| 2024/03/11 | 12:10:20 PM MST | 505-236-9610 | SMS | Incoming | It's 1600 with just the ultimate it would be 17. If I added the side Light Rail. I don't know if you can see it on the picture. |

| 2024/03/11 | 12:11:32 PM MST | 505-236-9610 | SMS | Outgoing | Yeha definitely want the light rail |
|---|---|---|---|---|---|
| 2024/03/11 | 12:11:51 PM MST | 505-236-9610 | SMS | Outgoing | How many can you line up? |
| 2024/03/11 | 12:12:06 PM MST | 505-236-9610 | SMS | Incoming | I'm about 10 days out. |
| 2024/03/11 | 12:13:46 PM MST | 505-236-9610 | SMS | Incoming | How many do you need? |
| 2024/03/11 | 12:15:29 PM MST | 505-236-9610 | SMS | Outgoing | Need 4 |
| 2024/03/11 | 12:16:24 PM MST | 505-236-9610 | SMS | Incoming | Sweet. Yeah, let me check supplies and I might be able to cut you a break since you're getting more than one. I'll get back to you here in a few. |
| 2024/03/11 | 12:16:54 PM MST | 505-236-9610 | SMS | Outgoing | Sounds good |
| 2024/04/17 | 02:34:00 PM MST | 505-236-9610 | SMS | Outgoing | You got those four ready? |
| 2024/04/17 | 02:50:16 PM MST | 505-236-9610 | SMS | Incoming | Hopefully shortly just waiting on the gas blocks and then to cerakote and test fire. |
| 2024/04/17 | 02:51:15 PM MST | 505-236-9610 | SMS | Outgoing | Right on |
| 2024/05/05 | 08:31:10 PM MST | 505-236-9610 | SMS | Outgoing | Yo |
| 2024/05/05 | 08:31:26 PM MST | 505-236-9610 | SMS | Outgoing | You got any 249s? |
| 2024/05/05 | 08:56:15 PM MST | 505-236-9610 | SMS | Incoming | The shop has 2 |
| 2024/05/05 | 09:30:17 PM MST | 505-236-9610 | SMS | Outgoing | How much?  Around 10g? |

29

| 2024/05/05 | 09:31:34 PM MST | 505-236-9610 | SMS | Incoming | Yeah. My buddy will have 2 semi mg-42's ready in the next couple weeks. |
| 2024/05/05 | 09:32:43 PM MST | 505-236-9610 | SMS | Outgoing | Good shit |
| 2024/05/05 | 09:33:39 PM MST | 505-236-9610 | SMS | Outgoing | Those mg42s take 762? |
| 2024/05/06 | 08:44:58 AM MST | 505-236-9610 | SMS | Incoming | One is 8mm mauser the other is 7.62. But the caliber conversion is easy peasy |
| 2024/05/06 | 11:29:30 AM MST | 505-236-9610 | SMS | Outgoing | Ahh shit nah they will only do the 762 or 556 |
| 2024/05/06 | 11:29:48 AM MST | 505-236-9610 | SMS | Outgoing | How are the aks looking? If those come iut good lets talk serious business |
| 2024/05/06 | 11:34:48 AM MST | 505-236-9610 | SMS | Outgoing | How much for that 762 mg42? |
| 2024/05/06 | 11:36:05 AM MST | 505-236-9610 | SMS | Incoming | 8k, we just did headspacing and test fire. Just needs the refinish and it's ready to go. I'll try to get some pics. The aks are almost ready! Excited. Once their done I'll send some good photos. |
| 2024/05/06 | 11:39:37 AM MST | 505-236-9610 | SMS | Outgoing | Fuck yeah lmk.  Thats a good price let me check never done a 42 w them before but if theyre in we can do that all day. Same w the 249s and 50s |

| | | | | | |
|---|---|---|---|---|---|
| 2024/05/06 | 08:26:55 PM MST | 505-236-9610 | SMS | Outgoing | Should be good for the 42, pics and video will help since they havent tried it before.  Probably just one to start and if it works for them can do more. |
| 2024/05/21 | 12:40:50 PM MST | 505-236-9610 | SMS | Outgoing | You got the pics of the 42s? |
| 2024/06/03 | 04:43:02 PM MST | 505-236-9610 | SMS | Outgoing | Yo |
| 2024/06/03 | 04:43:48 PM MST | 505-236-9610 | SMS | Outgoing | How they looking |

48.     Thereafter, SHAW dropped contact with the UCA.  In the period thereafter, Jason's Guns went offline, and a new website – Jane's Guns – went online.  Over the period of several months, through December 2024, ATF Intelligence Analysts relayed that there were multiple postings by 505-236-9610, the number associated with SHAW, seeking to purchase firearms parts.  As recent as March 10, 2025, ATF intel analysts observed a posting on Jane's Guns where a user with the same phone number ending in 9610 posted an advertisement for firearm parts and accessories.  In the ad, SHAW claimed he was looking to purchase a "7.5 or 10.3/10.5 complete upper," and claimed he could be reached by text with inquires at 505-236-9610.  A photograph is included below for reference



**Presence at the PREMISES**

49.        On February 12, 2025, ATF TFOs Garcia and Flores conducted surveillance at the PREMISES. At approximately 8:17 AM, TFO Garcia saw an individual consistent with SHAW exit the residence through the garage.  TFO Garcia observed a black Hyundai SUV in the driveway of the PREMISES which SHAW appeared to get into and drive.  TFOs Garcia and Flores conducted mobile surveillance on the vehicle and observed SHAW exit the vehicle at a neighborhood Walmart near the intersection of NM-528 and Southern.  TFO Garcia reviewed an ATF report with photographs from a previous encounter with SHAW and positively identified SHAW as the individual observed at the PREMISES.

50.        On February 13, 2025, ATF TFO Steeples and ATF SA Mejia conducted surveillance at the PREMISES.  At approximately 9:15 AM, TFO Steeples and SA Mejia observed a male who they positively identified as SHAW sitting on the porch of the PREMISES.  TFO Steeples and SA Mejia observed SHAW enter a black Hyundai SUV with

and depart from the PREMISES.

51.      On March 20, 2025, I received mail notification from United States Postal Inspector SA Erica Rosenblum that SHAW was receiving mail at the PREMISES with the most recent parcel addressed to him and delivered on March 17, 2025.

52.      On March 20, 2025, I conducted a records check and determined that SHAW has a valid Driver's License and the address on the license is the PREMISES.

## CONCLUSION

53.      I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Allison Garcia
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Electronically signed and telephonically sworn
on March 31st 2025.

Honorable Steve C. Yarbrough
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be searched*

The property to be searched is 4260 Russel Ct. NE Rio Rancho, NM 87124, hereinafter the "PREMISES," further described as a white house with brown trim and an attached garage. The numbers "4260" are affixed in black on the front of the house facing Russel Ct.  A photograph of the PREMISES is included below:



The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES, all persons located on the PREMISES in or on which the items to be seized could be concealed, and all vehicles parked at, or in front of, the PREMISES that have an apparent connection to the PREMISES and/or to Asa SHAW.  The search shall specifically

include the person of SHAW, and the vehicle described below, if they are present at the PREMISES at the time of the search.

*Person to be searched: Asa SHAW*

Asa SHAW is a white male with green eyes, approximately 5'9" and approximately 190 pounds. Two photographs of SHAW are included below:



*Vehicles to be searched*

The search of the above PREMISES shall include a black Hyundai Palisade bearing New Mexico license plate BPHZ61. SHAW was seen departing the PREMISES on multiple occasions in this vehicle. The search of the above PREMISES shall also include a 2022 Gray Nissan Sentra bearing New Mexico license plate 573WYF. This vehicle is registered to SHAW at the PREMISES.

**ATTACHMENT B**

*Property to be seized*

All records, information, and evidence relating to violations of 18 U.S.C. § 933, that being trafficking in firearms, and 18 U.S.C. § 922(a)(1)(A), that being dealing and manufacturing of firearms without a license, involving Asa SHAW, including:

1. Firearms and ammunition, including but not limited to handguns, rifles, shotguns, receivers, and automatic weapons.

2. Firearms components, parts, and tools that may be used to manufacture firearms.

3. Large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of transactions.

4. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

5. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their trafficking associates.

6. Messages, notes, correspondence, and/or communications between trafficking associates.

7. Indications of ownership or residency of the PREMISES and/or other premises used in unlawful trafficking or unlicensed dealing activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

8. Indications of ownership or use over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

9.  Records, receipts, bank statements and records, money drafts, tax documents, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

10. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the traffickers themselves.

11. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of firearms or firearm parts and accessories.

12. Digital video surveillance systems, including the associated storage media.

13. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the PREMISES and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the PREMISES in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.